Electronically Filed
Intermediate Court of Appeals
CAAP-14-0001030
29-JUN-2018
08:58 AM

NO. CAAP-14-0001030

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

ESTATE OF ROBERT FREY, Plaintiff-Appellant,
v.
ROBERT P. MASTROIANNI, M.D., Defendant-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CIVIL NO. 07-1-0206(1))

MEMORANDUM OPINION
(By: Ginoza, Chief Judge, Fujise and Chan, JJ.)

In this appeal arising out of a medical malpractice action, Plaintiff-Appellant Estate of Robert Frey (Estate of Frey) appeals from the Judgment, filed on July 25, 2014, in the Circuit Court of the Second Circuit (circuit court).[1]  Judgment was entered against the Estate of Frey and in favor of Defendant-Appellee Robert P. Mastroianni, M.D. (Dr. Mastroianni) on all claims asserted by Frey in the Complaint.

I. BACKGROUND

A. Facts alleged by the Estate of Frey are as follows:

On June 11, 2004, Robert Frey (Frey) ingested an unknown quantity of Gamma-Hydroxybutyrate (GHB), a sedative.  As a result of his GHB ingestion, Frey fell, sustaining a contusion and laceration to his forehead.  An ambulance was called and Frey

---

[1] The Honorable Rhonda I.L. Loo presided.

was taken to the emergency room at Maui Memorial Medical Center. Frey was then transferred to the intensive care unit and treated by Dr. Mastroianni over the next two days. On June 13, 2004, Dr. Mastroianni discharged Frey in stable condition on oral antibiotics with a diagnosis of bronchitis.

After Frey's release, his condition worsened and he was readmitted to the hospital the next day on June 14, 2004, with a diagnosis of pneumonia and sepsis caused by bacteria in his lungs, Klebsiella, which the Estate of Frey contends entered his lungs when Frey had vomited while unconscious before hospitalization and/or when Frey was intubated to assist with breathing during his first hospitalization. Frey died on June 15, 2004 as a result of the pneumonia.

B. Procedural Background

Pursuant to Hawaii Revised Statutes (HRS) Chapter 671, the Estate of Frey filed a claim against Dr. Mastroianni with the Medical Claims Conciliation Panel (MCCP) on June 13, 2006.

On June 12, 2007, after the case was heard and decided by the MCCP, a Complaint was filed on behalf of the Estate of Frey and various family members[2], against Dr. Mastroianni for medical malpractice and wrongful death. The Estate of Frey alleged in its Complaint that the medical treatment rendered by Dr. Mastroianni fell below the standard of care and that his negligence was a substantial factor causing Frey's death due to Dr. Mastroianni's: (1) misdiagnosis of Frey's condition as bronchitis rather than the proper diagnosis of pneumonia, despite the evidence of the presence of infiltrates in his chest x-ray, his persistent fever, and his probable aspiration of vomit while he had been unconscious; (2) failure to start Frey on broad spectrum intravenous antibiotics soon after his first admission;

---

[2] Family members, Michael Frey, Mary Frey, Elizabeth Koether, Audrey Frey, and Albert Frey's claims against Dr. Mastroianni were dismissed pursuant to the Order Granting Defendant Robert P. Mastroianni, M.D.'s Motion for Partial Summary Judgment, Filed Herein on 03/17/09, filed on May 6, 2009 and the Order Granting Defendant Robert P. Mastroianni, M.D.'s Motion to Dismiss Claims of Plaintiffs Albert Frey and Audrey Frey, Filed Herein on December 21, 2011, filed on January 27, 2012.

2

(3) failure to obtain another chest x-ray the day Frey was discharged; and (4) discharge of Frey on June 13th without determining the reason for his fever. After several continuances, the circuit court set the matter for jury trial on July 7, 2014. Jury trial commenced on July 8, 2014.

On July 9, 2014, after the presentation of the Estate of Frey's case-in-chief, Dr. Mastroianni moved for judgment as a matter of law (JMOL) arguing that the Estate of Frey failed to present any expert testimony that the care and treatment provided by Dr. Mastroianni caused Frey's death and the Estate of Frey should not be allowed to pursue an alternative claim for lost chance of survival. The circuit court granted Dr. Mastroianni's JMOL motion, holding that:

> In addition to establishing the relevant medical standard of care through expert testimony, a plaintiff must produce expert medical testimony to establish with a reasonable degree of medical certainty that a physician's care and conduct towards a patient was a proximate or contributory cause of the plaintiff's death.
> In this case, the Court pored over the deposition transcripts that were read to the jury yesterday and re-read the Court's notes from Dr. Schultz's testimony, and the Court finds that none of the Plaintiff's experts opined to a reasonable degree of medical probability as to whether Mr. Frey would have survived had he not been discharged by Dr. Mastroianni.

Judgment in favor of Dr. Mastroianni was entered on July 25, 2014.

## II. POINTS OF ERROR

The Estate of Frey alleges the following points of error on appeal:

(1) The circuit court erred in holding that it did not have jurisdiction over its loss of chance claim;

(2) The circuit court erred in ignoring a loss of chance theory of causation;

(3) The circuit court improperly granted Dr. Matroianni's motion for Judgment as a Matter of Law without a sufficient basis in the record;

(4) The circuit court abused its discretion when it granted Dr. Mastroianni's motion in limine to exclude portions of

3

the expert evidence as "new opinions;"

(5) The circuit court abused its discretion when it excluded expert opinions on radiology, based on an improper application of Hawaii Rules of Evidence Rule 702;

(6) The circuit court improperly excluded expert evidence as speculative;

(7) The circuit court improperly ruled that Pneumonia Severity Index testimony was not proper rebuttal testimony;

(8) The circuit court improperly failed to take judicial notice of a Life Expectancy Table;

(9) The circuit court improperly excluded portions of Donald Regalmuto's testimony at trial.

### III. DISCUSSION

#### A. Circuit Court's Jurisdiction over "Loss of Chance" Claim

##### 1. Medical Claim Conciliation Panel (MCCP) Process

Hawaii Revised Statutes (HRS) Chapter 671 was enacted to facilitate efficiency and stability in the resolution of medical malpractice actions. Lee v. Hawaii Pacific Health, 121 Hawai'i 235, 243-44, 216 P.3d 1258, 1266-67 (App. 2009) (citing Kaiser Found. Hosps., 90 Hawai'i 425, 438-39, 978 P.2d 863, 876-77 (1999)). "The MCCP process was created to encourage early settlement of claims and to weed out unmeritorious claims through review, rendering of findings, and issuance of advisory opinions on issues of liability and damages by panels with both medical and legal expertise." Id.

At the time of Frey's death, HRS § 671-12(a) (1993) stated that:

> [A]ny person or the person's representative claiming that a medical tort has been committed shall submit a statement of the claim to the medical claim conciliation panel before a suit based on the claim may be commenced in any court of this State. Claims shall be submitted to the medical claim conciliation panel in writing. The claimant shall set forth facts upon which the claim is based and shall include the names of all parties against whom the claim is or may be made who are then known to the claimant.

HRS § 671-1(2)(1993) defines "medical tort" as "professional negligence, the rendering of professional service without informed consent, or an error or omission in professional

4

practice, by a health care provider, which proximately causes death, injury, or other damage to a patient."

The applicable version of HRS § 671-16 provides the circumstances under which claims may be filed in court as follows:

> **§ 671-16 Subsequent litigation; excluded evidence.** The claimant may institute litigation based upon the claim in an appropriate court only after a party to a medical claim conciliation panel hearing rejects the decision of the panel, or after the twelve-month period under section 671-18 has expired.

HRS § 671-16 (Supp. 2003). Therefore, in order for a party to file suit against a health care provider arising from a "medical tort", they must first submit a written statement of "the claim" setting forth the "facts upon which the claim is based" to the MCCP for review.

Dismissal of a civil suit based on a medical tort claim is proper where a claimant files a suit before first having submitted a statement of the claim to the MCCP. See Dubin v. Wazukawa, 89 Hawaiʻi 188, 198, 970 P.2d 496, 506 (1998)(affirming a dismissal of plaintiff's first amended complaint where plaintiff "chose to sidestep the requirements of HRS §§ 671-12 and 671-16 by filing the present lawsuit, rather than first seeking resolution of his claims by an MCCP, as required by those statutes."); See also Buenafe v. Kiehm, No. 29237 (App. May 4, 2011)(SDO)(holding that because HRS § 671-12 requires that "the claim" being presented to the MCCP be set forth in a written statement of the claim, oral testimony during the MCCP hearing about an informed consent claim was not sufficient to grant the circuit court jurisdiction over such claim).

The Estate of Frey contends that the circuit court improperly dismissed its medical negligence claim based on a loss of chance theory of causation when it ruled the Estate of Frey failed to specifically plead "loss of chance" in its statement of the claim to the MCCP. The Estate of Frey argues that the circuit court improperly characterized its "loss of chance" theory as a separate cause of action rather than a theory of

5

causation and that HRS § 671-12 does not require a party to fully develop the theories of its case at the MCCP level. Therefore, our inquiry is not only whether the theory of recovery for loss of chance to survive predicated upon alleged medical malpractice is actionable in Hawai'i, but also whether the loss of chance doctrine is a distinct compensable injury creating a separate cause of action or rather a form of causation for a medical malpractice claim.

2. Loss of Chance

The loss of chance doctrine places a value on a patient's likelihood of achieving a more favorable outcome. Matsuyama v. Birnbaum, 452 Mass. 1, 3, 890 N.E.2d 819, 823 (2008) (explaining that "the loss of chance doctrine views a person's prospects for surviving a serious medical condition as something of value"). Under this doctrine, when a medical provider's negligence diminishes or eliminates a patient's prospect for a more favorable outcome or deprives a patient of an opportunity of survival, the medical provider has harmed the patient and is liable for damages. Dickhoff ex rel. Dickhoff v. Green, 836 N.W.2d 321, 334 (2013). Hicks v. U.S., was one of the first cases to acknowledge the significance of losing a chance to survive and is cited by many jurisdictions that have adopted some form of the doctrine. 368 F.2d 626 (4th Cir. 1966). In Hicks, the Fourth Circuit addressed the concept of loss of a substantial possibility of survival holding that a physician's failure to diagnose a condition that led to the death of the patient constituted negligence. Id. at 632-33. The court explained:

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a certainty that the patient would have lived had she been hospitalized and operated on promptly.

Id. at 632.

States remain divided in determining whether to adopt the loss of chance theory of recovery in an action for medical malpractice. See Matsuyama, 452 Mass. at 10 n.23 890 N.E.2d at 828 n.23 (listing states that have adopted, declined to adopt, or have not addressed the loss of chance doctrine). Jurisdictions rejecting the loss of chance doctrine choose to adhere to the traditional rules of causation or "all-or-nothing approach". See Kramer v. Lewisville Memorial Hosp., 858 S.W.2d 397, 399-400 (1993)(declining to adopt the loss of chance doctrine as part of the common law of Texas in favor of traditional causation principles); Gooding v. University Hosp. Bldg., Inc., 445 So.2d 1015 (Fla. 1984); Smith v. Parrott, 175 Vt. 375, 833 A.2d 843 (2003). In such jurisdictions, a plaintiff is required to show that the medical professional's negligence more likely than not caused the injury. Kramer, 858 S.W.2d at 400. In other words, if the plaintiff can show that the patient was negligently deprived of a greater-than-even or greater than 50% chance of avoiding the injury, in this case death, then the plaintiff can recover all damages resulting from the outcome. Id. In contrast, if the plaintiff can only show that the defendant's negligence caused the loss of a 50% chance or less chance of avoiding the ultimate harm, the plaintiff recovers nothing. Id. States that have adopted some form of the loss of chance doctrine have done so in response to their dissatisfaction with the sometimes harsh effects of the "all or nothing" rule in medical malpractice claims. See Matsuyama, 452 Mass. at 12-13, 890 N.E.2d at 829-30 ("So long as the patient's chance of survival before the physician's negligence was less than even, it is logically impossible for her to show that the physician's negligence was the but-for cause of her death, so she can recover nothing. Thus, the all or nothing rule provides a 'blanket release from liability for doctors and hospitals any time there was less than a 50 percent chance of survival, regardless of how flagrant the negligence.'")

7

In Matsuyama, the Supreme Judicial Court of Massachusetts explained that the "all or nothing" approach undermines the cost allocation and deterrence functions of tort law.

> Fundamentally, the all or nothing approach does not serve the basic aim of "fairly allocating the costs and risks of human injuries[.]" The all or nothing rule "fails to deter" medical negligence because it immunizes "whole areas of medical practice from liability." It fails to provide the proper incentives to ensure that the care patients receive does not slip below the "standard of care and skill of the average member of the profession practising [sic] the specialty." And the all or nothing rule fails to ensure that victims, who incur the real harm of losing their opportunity for a better outcome, are fairly compensated for their loss.

Matsuyama, 452 Mass. at 13, 890 N.E.2d at 830 (citations and footnote omitted). The Matsuyama Court, in adopting the loss of chance doctrine, agreed with the Supreme Court of Wyoming's reasoning in McMackin v. Johnson County Healthcare Ctr., which stated:

> First, the loss of an improved chance of survival or improvement in condition, even if the original odds were less than fifty percent, is an opportunity lost due to negligence. Much treatment of diseases is aimed at extending life for brief periods and improving its quality rather than curing the underlying disease. . . . Second, immunizing whole areas of medical practice from liability by requiring proof by more than fifty percent that the negligence caused the injury fails to deter negligence conduct. As Judge Posner wrote in DePass v. United States, [721 F.2d 203, 208 (7th Cir. 1983)] 'A tortfeasor should not get off scot free because instead of killing his victim outright he inflicts an injury that is likely though not certain to shorten the victim's life.'

Matsuyama, 452 Mass. at 13-14, 890 N.E.2d at 830-31 (quoting McMackin v. Johnson County Healthcare Ctr., 73 P.3d 1094, 1099 (Wyo. 2003)).

The application of the loss of chance doctrine has varied among jurisdictions that have adopted the theory. Dickoff, 836 N.W.2d at 334. Some jurisdictions have applied the loss of chance doctrine as a relaxed form of causation. McKellips v. Saint Francis Hosp. Inc., 741 P.2d 467 (Okla. 1987) (explaining that the relaxed causation approach permits recovery when the plaintiff establishes a "substantial possibility of

causation."); <u>See also</u> <u>Delaney v. Cade</u>, 255 Kan. 199, 873 P.2d 175, 185-86 (1994); <u>Hamil v. Bashline</u>, 481 Pa. 256, 268-69, 392 A.2d 1280, 1286 (1978). While other jurisdictions that have adopted the doctrine recognize the patient's lost chance as a distinct compensable injury creating a separate cause of action. <u>See</u> <u>Alexander v. Scheid</u>, 726 N.E.2d 272, 279 (Ind. 2000); <u>DeBurkarte v. Louvar</u>, 393 N.W.2d 131, 136-37 (Iowa 1986); <u>Matsuyama</u>, 452 Mass. at 16-17, 890 N.E.2d at 832.

We agree with those courts that recognize loss of chance as a distinct compensable injury resulting from a medical provider's negligence. When one is deprived of a chance to survive due to a medical provider's negligence, the actual loss suffered is the lost chance itself and not the ultimate injury or death. Under this approach, damages recoverable are limited to the value of the lost chance. A plaintiff would need to prove that he or she initially had at least some chance of a more favorable outcome before the medical provider's negligence occurred. However, a plaintiff would not recover for loss of chance if the plaintiff is able to establish that the defendant's negligence caused the ultimate injury or death, instead the plaintiff would recover all damages compensable under a traditional negligence claim.

Recognizing loss of chance as the injury itself is consistent with the traditional rules of negligence.[3] If the injury is established -- i.e., that the patient lost a chance of surviving or lost a chance of a substantial increase in the length of such survival, the plaintiff must also prove that the

---

[3] In order to prevail on a negligence claim the plaintiff is required to prove:

> (1) A duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks; (2) A failure on the defendant's part to conform to the standard required: a breach of the duty; (3) A reasonably close causal connection between the conduct and the resulting injury[;] and (4) Actual loss or damage resulting to the interests of another.

<u>Takayama v. Kaiser Foundation Hosp.</u>, 82 Hawai'i 486, 498-99, 923 P.2d 903, 915-16 (1996).

medical provider breached his or her duty of care.  Additionally, the theory of loss of chance as a distinct injury is consistent with the traditional rules of causation.  A plaintiff must prove by a preponderance of the evidence that the medical provider's breach of duty caused the plaintiff's likelihood of achieving a more favorable outcome to be diminished.  As such, damages are then limited to only those proximately caused by the medical provider's breach of duty.

The Estate of Frey relies primarily on McBride v. U.S., 462 F.2d 72 (9th Cir. 1972), where the Ninth Circuit applied Hawai'i law in a wrongful death suit.  In McBride, Robert McBride had undergone testing to diagnose the source of pain in his lower chest at the hospital, which ultimately revealed no evidence of heart disease.  Id. at 73.  A few days later, McBride went to the emergency room upon experiencing severe chest pain.  Id.  The physician on duty attributed the chest pain to gastrointestinal disturbances but did not rule out heart disease, advising McBride be admitted to the coronary care unit.  Id.  McBride expressed a preference to return home, which the physician allowed on the condition that he return to the hospital immediately should the pain recur.  Id.  McBride died shortly after returning home from the hospital.  Id.

McBride's widow and minor children commenced a wrongful death action against the United States claiming that McBride's death was proximately caused by the negligent failure of the duty doctor at the hospital to admit McBride to a coronary care unit.  Id.  The trial judge dismissed the claim on the grounds that the plaintiffs had not established the requisite causal proximity between nonadmittance to the coronary care unit and McBride's death.  Id. at 74.  On appeal, the Ninth Circuit reversed and held that

> [w]hen a plaintiff's cause of action rests upon an allegedly negligent failure to give necessary treatment, he must show, with reasonable medical probability, that the treatment would have successfully prevented the patient's injury.  He need not prove with certainty that the injury would not have occurred after proper treatment. . . . the absence of positive certainty should not bar recovery if negligent

> failure to provide treatment deprives a patient of a
> significant improvement in his chances for recovery.

Id. at 75.

McBride has been cited approvingly by the Hawai'i Supreme Court in Craft v. Peebles, 78 Hawai'i 287, 305, 893 P.2d 138, 156 (1995). In Craft, the supreme court discussed the necessity of basing medical opinions upon reasonable medical probabilities for the purpose of establishing causation:

> That opinion, however, must be based on reasonable medical
> probability. See McBride v. United States, 462 F.2d 72, 75
> (9th Cir. 1972)(In a medical malpractice action, a plaintiff
> must show with reasonable medical probability a causal nexus
> between the physician's treatment or lack thereof and the
> plaintiff's injury.); Duff v. Yelin, 721 S.W.2d 365
> (Tex.App. 1986)(The opinion testimony of a medical expert
> providing the causal nexus must be grounded upon reasonable
> medical probability as opposed to a mere possibility because
> possibilities are endless in the field of medicine.)

Id.

Dr. Mastroianni argues that this court has expressly declined to recognize the loss of chance doctrine in its holding in Barbee v. Queen's Medical Center, 119 Hawai'i 136, 164, 194 P.3d 1098, 1126 (2008). We disagree. In Barbee, children of a deceased patient brought a medical malpractice action alleging negligent medical treatment which ultimately led to the patient's death. Id. at 143-44, 194 P.3d at 1106. The circuit court entered judgment against plaintiffs and in favor of the physician based in part on the plaintiffs' failure to provide expert medical testimony to establish causation. Id. at 145, 194 P.3d at 1107. On appeal, plaintiffs argued that they had proved causation by a preponderance of the evidence under the 'loss of chance doctrine'. Id. at 164, 194 P.3d at 1126. This court affirmed the circuit court's judgment concluding that "the fundamental requirement of establishing causation by expert medical testimony remains" and that the loss of chance doctrine does not relieve the plaintiffs of their burden of providing expert medical testimony to establish causation. Id. This court's holding in Barbee does not expressly decline to adopt the loss of chance doctrine, but rather reiterates the requirement of

11

providing expert medical testimony to establish causation in a medical malpractice action, including those actions based on the loss of chance doctrine.

Based on the foregoing, we conclude that the loss of chance doctrine is consistent with Hawai'i law and should be recognized as a separate compensable injury in circumstances such as this case. We note that our decision in recognizing loss of chance as a theory of recovery is thus limited to medical malpractice actions that result in death.

3. The Estate of Frey's MCCP Claim Letter

Based on our holding that loss of chance is a distinct compensable injury and as such is a separate claim based on alleged medical malpractice, we now turn to whether the Estate of Frey asserted its loss of chance claim at the MCCP level in order to institute litigation based upon this claim. The circuit court stated at trial on July 10, 2014 that:

> The Court finds that the requirements of HRS Chapter 671 are jurisdictional and upon review of records submitted, the Plaintiff has failed to raise a loss of chance claim before the medical claims conciliation panel; therefore, the Court lacks subject matter jurisdiction over loss of chance claim irrespective of whether this claim is recognized in Hawaii as a valid distinction claim.

The Estate of Frey's MCCP Claim Letter submitted to the MCCP, stated in relevant part:

> Pursuant to Hawaii Revised Statutes, 671-1, et seq., Claimants Estate of Robert Frey, Albert Frey, Audrey Frey, Michael Frey, Mary Frey, and Elizabeth Koether, by and through their attorney, Anthony L. Ranken of Ranken & Drewyer, hereby present a claim for damage resulting from Robert Frey's death, which occurred as a result of the negligence of the following respondent:
>     Robert P. Mastroianni, M.D.
>         . . . .
> Claimants allege that Robert P. Mastroianni, M.D., fell below the applicable standard of care in multiple respects, including but not limited to the following: (1) failing to start Mr. Frey on broad spectrum intravenous antibiotics soon after the first admission, when it became clear that he had pneumonia; (2) discharging the patient on June 13th without determining the reason for his fever; (3) not repeating the chest X-ray on June 13th, which would clearly have shown pneumonia; and (4) misdiagnosing Mr. Frey's condition as bronchitis, despite the evidence of his chest x-rays, his fever of 102, and his probable aspiration of vomit while he had been unconscious.

12

> If Dr. Mastroianni had administered antibiotics in the hospital on June 11[th] or 12[th], repeated the chest x-ray on June 13[th], and kept Mr. Frey in the hospital for further observation and treatment, then with the benefit of closer observation and care <u>it is likely that he would have survived</u>.

(Emphasis added).

We determine that the Estate of Frey's statement of its claim to the MCCP did not assert a loss of chance claim. The Estate of Frey's statement that if not for Dr. Mastroianni's inaction, "it is likely that [Frey] would have survived," at most, indicates a wrongful death action based upon alleged medical malpractice, i.e. the statement included facts necessary to support a professional negligence claim against a health care provider that proximately caused death. By comparison, the Estate of Frey's Complaint alleged not only that Dr. Mastroianni's actions were a substantial factor in causing Frey's death, but also alleged that "[i]n the alternative, Defendant's negligent treatment deprived [Frey] of a significant improvement in his chances for recovery, and/or resulted in a loss of an increased chance of recovery, which loss of chance is compensable in and of itself." The statement of the claim to the MCCP did not put Dr. Mastroianni on notice that a loss of chance claim based upon the alleged medical malpractice was being asserted. As such, the Estate of Frey did not satisfy the requirements set forth in HRS § 671-12(a), for purposes of instituting a claim for loss of chance. Therefore, the circuit court did not err when it dismissed the Estate of Frey's loss of chance claim because it lacked subject matter jurisdiction over the claim.

B. Judgment as a Matter of Law

The Estate of Frey further contends that the circuit court erred when it granted Dr. Mastroianni's Motion for JMOL on grounds that the Estate of Frey failed to provide expert medical testimony to establish with a reasonable degree of medical probability that Dr. Mastroianni's care and conduct was a proximate or contributory cause of Frey's death.

Hawai'i Rules of Civil Procedure (HRCP) Rule 50 states,

13

in pertinent part:

> (a) Judgment as a Matter of Law.
>
> (1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

We review the circuit court's grant of Dr. Mastroianni's JMOL Motion *de novo* and apply the same standard as the trial court. Aluminum Shake Roofing, Inc. v. Hirayasu, 110 Hawai'i 248, 251, 131 P.3d 1230, 1233 (2006) (quoting Miyamoto v. Lum, 104 Hawai'i 1, 6-7, 84 P.3d 509, 514-15 (2004) (internal citations omitted)).

> "A [motion for JMOL] may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor." [*Miyamoto*, 104 Hawai'i] at 7, 84 P.3d at 515 (quoting *Tabieros* [*v. Clark Equipment Co.*], 85 Hawai'i [336,] 350, 944 P.2d [1279,] 1293 [(1997)]).

Ray v. Kapiolani Med. Specialists, 125 Hawai'i 253, 262, 259 P.3d 569, 578 (2011).

This court in Bernard v. Char, 79 Hawai'i 371, 903 P.2d 676 (App. 1995) has previously explained that:

> Traditionally, medical malpractice cases have been predicated on the negligent failure of a physician or surgeon to exercise the requisite degree of skill and care in treating or operating on a patient. As with other negligence actions, the plaintiff in a medical malpractice case based on negligent treatment has the burden of establishing a duty owed by the defendant to the plaintiff, a breach of that duty, and a causal relationship between the breach and the injury suffered.

Bernard, 79 Hawai'i at 377, 903 P.2d at 682 (footnote and citations omitted). The plaintiff must demonstrate that "the defendant's treatment deviated from any of the methods of treatment approved by the standards of the profession." Id.

Additionally, in medical negligence cases, "a plaintiff must establish proximate or contributory causation through the introduction of expert medical testimony." Barbee, 119 Hawai'i

14

at 158-59, 194 P.3d at 1120-21. That opinion must be grounded upon a reasonable degree of medical probability as opposed to mere possibility. Craft, 78 Hawai'i at 305, 893 P.2d at 156. Expert opinion is generally required because "lay jurors are ill prepared to evaluate complicated technical data for the purpose of determining whether professional conduct conformed to a reasonable standard of care and whether there is a causal relationship between the violation of a duty and an injury to the patient." Bernard, 79 Hawai'i at 377, 903 P.2d at 682 (citation omitted).

The Estate of Frey contends that Dr. Mastroianni's misdiagnosis and early discharge was negligent and Dr. Mastroianni's negligence was a substantial factor in Frey's death. The Estate of Frey presented three medical doctors as expert witnesses for trial: an internal medicine doctor and hospitalist, Peter Schultz, M.D. (Dr. Schultz); an infectious disease specialist, Darvin Scott Smith, M.D. (Dr. Smith); and a general practitioner/internist who had worked in the emergency ward of a hospital, Bradley Jacobs, M.D. (Dr. Jacobs), all of whom based their opinions upon a reasonable degree of medical probability.

Through the testimony of its expert witnesses, the Estate of Frey was required to establish with a reasonable degree of medical probability that a causal nexus existed between the physician's treatment or lack thereof, and the patient's death. Barbee, 119 Hawai'i at 163, 194 P.3d at 1125. However, in this case, the expert medical testimony fell short of providing a causal nexus between Dr. Mastroianni's alleged negligence and Frey's death.

Dr. Schultz testified that in his medical expert opinion, it was not an appropriate decision to discharge Frey from the hospital on June 13, in light of his condition at that time and that Dr. Mastroianni's improper diagnosis and early discharge fell below the standard of care expected of a physician. Dr. Schultz indicated that his opinion was based on

15

"looking at the totality of the clinical picture, all of the factors that led up to his being hospitalized and his condition at the time . . . of discharge." Dr. Schultz further testified that it was his opinion that if Robert Frey had remained in the hospital, that it would have improved his chances of survival significantly.

Dr. Jacobs testified that Dr. Mastroianni's early discharge and misdiagnosis of Frey fell below the standard of care expected of a physician. In his testimonial deposition presented to the jury at trial, Dr. Jacobs was questioned regarding the basis for his opinions as follows:

[By counsel for the Estate of Frey] Q. In that regard, what specific conclusions did you reach from your review of this case as to the care that Dr. Mastroianni rendered to Robert Frey and in what ways it fell short of the standard of care?

A. The doctor discharged the patient too early and gave him an inappropriate diagnosis of bronchitis.
The patient should have been kept in the hospital and monitored until it was clear that his infection had resolved, that he was stable to be discharged home.

Q. So what factors led you to conclude that the patient should not have been discharged at the time he was on June 13th?

A. The patient's vital signs, which we take routinely. Vital signs are when you get -- identify someone's temperature, their blood pressure, their pulse, their oxygen level, and their breathing. Those can help us figure out someone's clinical status and those are very important. Hence, they're called the vital signs. In this patient, he remained febrile.

Q. Meaning?

A. Meaning he had a fever. And remember, he did not have a fever when he came to the emergency room. Now he had a fever. Now that fever could be attributable to a chemical burn in one's lung or it could be attributed to an infection.
So then you look at the other vital signs to think through whether or not this could be an infection or a chemical burn.
The second important vital sign, this one is blood pressure. When he came into the emergency room, his blood pressure had a systolic, the top number, blood pressure of 155.
Throughout his hospital stay, his blood pressure dropped to a systolic blood pressure of 105. That's concerning. Why would someone have a drop in their blood pressure?
When you're worried about a chemical burn versus pneumonia, you think bacteria causes pneumonia. Bacteria

16

also makes the body dilate those blood vessels, which makes you lower the blood pressure. That makes you think this person could have pneumonia, an infection in his body, making you lower your blood pressure.

The next vital sign is the pulse. His pulse was up, which could occur in a setting of a fever.

So then you look at his breathing status. Is he breathing regular and calm? Is he breathing more rapidly?

If you look at the vital signs, his breathing and his respiratory rate was up. It was increased. That's a little bit concerning.

. . . .

If you combine all of those vital signs together, it was clear this person has pneumonia, not a chemical burn.

Similarly, Dr. Smith testified that Dr. Mastroianni's treatment of Frey did not comply with the standard of care and that based on the observed vital signs of Frey throughout his hospitalization, "it would have been best practice and standard of care to continue to observe [Frey] closely and address . . . those observations in a timely way such that he would have responded appropriately." Upon discharge by Dr. Mastroianni, Frey was prescribed an antibiotic, Levofloxacin, to be taken orally, to treat Dr. Mastroianni's bronchitis diagnosis. In Dr. Smith's testimonial deposition presented to the jury at trial, he opined as to the following regarding Frey's treatment:

[By counsel for the Estate of Frey] Q. Now, he did get a prescription when he left the hospital that he had to go fill, Levofloxacin; is that correct?

A. That's right. Levofloxacin orally.

Q. Would there have been any advantage to having him in the hospital administering these empiric broad spectrum antibiotics?

A. Absolutely. There would be an advantage if he were in the hospital to give him IV antibiotics, which would get into the blood stream and would be a higher dose and a higher more biologically accessible medicine, if it's through the IV as opposed to oral.

At the same time, he could get resuscitated, as I was mentioning before, with the fluids to maintain his blood pressure, to maintain his normal pulse.

Q. And any other antibiotics, would they have helped as well?

A. Well, other antibiotics could have been given and would have been give had the correct diagnosis been even considered.
Q. In light of the fact that he did turn out to have this Klebsiella pneumonia, would there have been any use to giving him other antibiotics as well as the intervenous

Levofloxacin?

A. So it turns out, in retrospect, that the Klebsiella was indeed sensitive to most antibiotics including Levofloxacin. But my contention is that if he were given antibiotic IV, but also at a higher dose and maybe with other antibiotics, but importantly with fluids and observation of his status -- close observation of his status, that would have all happened.

Q. Now, what would have been different? I mean, you've listed some things that lists observations and fluids and IV antibiotics. Is there anything else that would have been different under competent treatment in the hospital, if he had remained on June 13th instead of being discharged?

. . . .

THE WITNESS: Yes. I think the main fact that it would be different is just the timing. It's all about the timing, and it was critical that he got all of those things that you listed I went through sooner.
    Sooner is better when you're dealing with a critical illness like this. And so he would have responded much better had that been addressed right away.

The expert medical testimony provided at trial, at most, established that had Frey remained in the hospital, his chance of a better outcome would have improved. This evidence only indicates that it was merely a possibility that Dr. Mastroianni caused Frey's death, "a showing which the Hawai'i supreme court explicitly found to be insufficient in *Craft*, 78 Hawai'i at 305, 893 P.2d at 156." Barbee, 119 Hawai'i at 163, 194 P.3d at 1125. The Estate of Frey failed to provide any expert medical testimony establishing that Dr. Mastroianni caused Frey's death "to a reasonable degree of medical probability." In short, there was no evidence from which a jury reasonably could have concluded that Dr. Mastroianni committed a breach of the standard of care in his treatment of Frey and that Dr. Mastroianni's breach of duty caused Frey's death.

Based on the foregoing, we conclude that the circuit court did not err in granting Dr. Mastroianni's Motion for JMOL.

D. Exclusion of Expert Testimony

The Estate of Frey contends that the circuit court improperly curtailed the opinion testimony of its expert witnesses through its rulings on various motions in limine. The circuit court granted Dr. Mastroianni's motions in limine ruling

18

that, *inter alia*, the Estate of Frey's expert witnesses would be precluded from "providing any opinions that were not previously disclosed in [their] reports or discovery depositions which were submitted on or before the deadline to produce expert reports" and the plaintiff's experts would be precluded "from offering expert opinions in the area of radiology." Specifically, the circuit court ordered that testimony of Dr. Smith, which goes beyond his previously disclosed opinions, including opinions regarding sepsis, cause of death, impact of Tylenol, additional tests during hospitalization, and opinions outside the area of Dr. Smith's expertise, such as testimony concerning radiology or his review of the chest x-ray are precluded. In regards to Dr. Jacobs's testimony, the circuit court precluded his opinions on Frey's chest x-rays and speculative testimony concerning the outcome of treatment provided to Frey had he stayed in the hospital.

Because the granting or denying of a motion in limine is within the trial court's inherent power to exclude or admit evidence, we review the court's ruling for abuse of discretion. State v. Kealoha, 95 Hawai'i 365, 379, 22 P.3d 1012, 1026 (App. 2000) (internal quotation marks, citations, and brackets omitted). An abuse of discretion occurs if the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 114, 839 P.2d 10, 26 (1992).

In view of the foregoing, we determine that the circuit court did not abuse its discretion in granting Dr. Mastroianni's motions in limine which excluded portions of the Estate of Frey's expert witnesses' testimony at trial. As such, upon careful review of the record, the Estate of Frey failed to provide any expert witness testimony establishing, with a reasonable degree of medical probability, a proximate or contributory causal nexus between a breach of duty owed by Dr. Mastroianni and Frey's death.

19

Inasmuch as we have determined on appeal that the grant of Dr. Mastroianni's JMOL Motion was proper under the circumstances, we need not address the Estate of Frey's remaining points on appeal relating to the exclusion of the Pneumonia Severity Index, Life Expectancy Table, and the exclusion of portions of Donald Regalmuto's Testimony as these issues would have no bearing on the outcome of the case.

IV. CONCLUSION

Based on the foregoing, the Judgment filed on July 25, 2014, is affirmed.

DATED: Honolulu, Hawai'i, June 29, 2018.

On the briefs:

Anthony L. Ranken,
and Samuel P. Shnider,
(Anthony Ranken & Associates),
for Plaintiff-Appellant.

Thomas E. Cook,
and Bradford F. K. Bliss,
(Lyons Brandt Cook &
Hiramatsu),
for Defendant-Appellee.

Chief Judge

Associate Judge

Associate Judge